UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

JOHN MICHAEL SISNEROS,

    Plaintiff,

vs.                                      No. _____

                                               (JURY IS REQUESTED)

**ORIGINAL**

**CARRIAGE SERVICES
OF NEW MEXICO, INC.**

    **Defendant.**

**COMPLAINT FOR RACE/NATIONAL ORIGIN DISCRIMINATION
AND FOR PUNITIVE DAMAGES**

**PLAINTIFF, JOHN MICHAEL SISNEROS**, by and through his attorney, Dennis W. Montoya, for his complaint states as follows:

**JURISDICTION AND VENUE**

1.    Plaintiff, JOHN MICHAEL SISNEROS, at all times relevant to this action, was and is a resident of Santa Fe County, New Mexico, within the federal judicial District of New Mexico;

2.    Defendant, CARRIAGE SERVICES OF NEW MEXICO, INC. (hereinafter "Carriage Services"), is a corporation organized pursuant to the laws of the State of New Mexico. Carriage Services is in the business of providing funeral services, and *inter alia* is responsible for the operation of the Berardinelli Family Funeral Service funeral home located at 1399 Luisa Street in Santa Fe, New Mexico;

3.    At times relevant to this action, Plaintiff was an employee of Berardinelli Family Funeral Service funeral home, and of Carriage Services;

4. At all times relevant to his action, Plaintiff is and was a Hispanic native of the American Southwest, and therefore was within a protected class within the meaning of Title VII, United States Code;

5. At all times relevant to this action, responsible management officials of the Defendant knew and had reason to know of Plaintiff's protected status;

6. This action is based on acts and omissions that occurred in the County of Santa Fe, State and federal judicial district of New Mexico;

7. This action is brought pursuant to Title VII, United States Code;

8. Plaintiff filed a timely complaint of discrimination and the complaint was duly investigated. Plaintiff has been issued a "Dismissal and Notice of Rights" with respect to his complaint. Plaintiff has satisfied all administrative prerequisites to filing suit, and this suit is timely filed;

9. Jurisdiction and venue over this action are proper in the United States District Court for the District of New Mexico;

## FACTS COMMON TO ALL COUNTS

10. The foregoing paragraphs are herein incorporated as if fully set forth;

11. In or around the month of November, 1998, Carriage Services purchased or otherwise acquired a controlling interest in Berardinelli Family Funeral Service in Santa Fe, New Mexico;

12. On November 18th, 1998, Carriage Services and Plaintiff executed and entered into an "Employment Agreement" drafted by Carriage Services and in no way substantially modified by Plaintiff, which Employment Agreement specified that the Plaintiff "shall perform

the professional, management and administrative duties of Assistant Manager of the Berardinelli Family Funeral Service."

13. The Employment Agreement further specified a contract term of five (5) years;

14. The Employment Agreement further specified that "The Company shall have the right to advertise its business as being carried on in the manner and tradition and according to the standards established by the Employee;"

15. In the Wednesday, November 25, 1998, edition of the Santa Fe New Mexican newspaper, Rick Berardinelli, President of the Berardinelli Family Funeral Service, who is not Hispanic, acting on behalf and at the behest of Carriage Services, announced, among other things, that

> [The Berardinelli Family Funeral Service] funeral home has recently been selected to join Carriage Services, a nation-wide coalition of preferred funeral homes…. This partnership will mean that you and your families will continue to be served to the best of our ability utilizing our existing staff, all of whom will receive the benefit of ownership. The funeral home will continue to be operated locally. Bob Clifford has been promoted to Manger and Michael Sisneros [Plaintiff] to Assistant Manager…

16. At the time of the foregoing announcement, Plaintiff had been in the funeral business in Santa Fe, New Mexico, for many years, and was well-known in the Santa Fe community;

17. Plaintiff's mother, Arlene Sisneros, a long-time state employee who has been active in politics, is also well-known in the Santa Fe community;

18. The announcement made in the Santa Fe New Mexican made intentional use of Plaintiff's name and specified that he was "promoted … to Assistant Manager" in order to

exploit Plaintiff's reputation and that of his family in the Santa Fe and northern New Mexico communities;

19.   Plaintiff's reputation and that of his family are directly related to Plaintiff's race/national origin, i.e., Hispanic native of the Santa Fe, New Mexico, area;

20.   Defendant, from the inception of its employment of the Plaintiff, engaged in a deliberate and calculated plan to exploit Plaintiff's ethnic and racial heritage while denying Plaintiff the appropriate benefits of his employment;

21.   The Employment Agreement includes no provision that would permit Defendant to reduce, alter or substantially change Plaintiff's designation from "Assistant Manager";

22.   After execution of the Employment Agreement, despite Plaintiff's repeated requests, Defendant failed and refused to supply Plaintiff with a position description for his job of Assistant Manager;

23.   After execution of the Employment Agreement, despite Plaintiff's repeated requests, Defendant failed and refused to supply Plaintiff with a copy of any of his periodic performance evaluations;

24.   After execution of the Employment Agreement, Plaintiff was repeatedly treated by employees of the Defendant in an off-handed, disrespectful manner.  For a lengthy period of time the Office Manager would order Plaintiff's business cards with "Funeral Director" or similar words on them, and not "Assistant Manager."  When Plaintiff requested that "Assistant Manager" be printed on his business cards, the Office Manager at first refused to do so, and would only order business cards with "Assistant Manager" printed on them after the request was approved by the Location Manager;

25. Beginning very early in Plaintiff's employment under Carriage Services at Berardinelli's, it began to become increasingly clear that the company had no intention to honor Plaintiff's contract and to treat him as the Assistant Manager of the funeral home. On November 18, 1998, when Carriage Services took over, Plaintiff still had a stock of Berardinelli's business cards that said "Funeral Service Practitioner," and not "Assistant Manager." Thereafter, Judy Keane, the Office Manager, ordered Plaintiff a new stock of business cards, without consulting him, and these new business cards still said "Funeral Service Practitioner." When Plaintiff eventually brought this to her attention and requested that Plaintiff's business cards say "Assistant Manager," consistent with what Plaintiff's written contract said and what Plaintiff's understanding of his role was, she refused to do so, and insisted that Bob Clifford had to be consulted about Plaintiff's request. When Plaintiff consulted Bob Clifford about this he would not immediately agree to ordering Plaintiff's business cards with the title "Assistant Manager" on them. Instead, Bob Clifford said that he would have to "look into it." It was only sometime thereafter that Plaintiff received one supply, the only supply Plaintiff ever received, of business cards listing his title as "Assistant Manager";

26. During the course of Plaintiff's 14 months of employment at Berardinelli's under Carriage Services, it became increasingly clear that Judy Keane, the Office Manager and a non-Hispanic, was treated as the Assistant Manager, and Plaintiff was not. This was apparent from the following:

?? Plaintiff was rarely included in management personnel meetings. Bob Clifford, who is not Hispanic, would hold these meetings on a very regular basis with Judy Keane

and with Karla Smail, also a non-Hispanic the Pre-Need Department Manager, and Plaintiff was not invited;

?? Plaintiff was required to receive the permission of Judy Keane, in addition to Bob Clifford, in order to take vacation time off from work;

?? Plaintiff was not consulted or his input was overlooked, with respect to major occurrences and decisions at Berardinelli's. These included, but were not limited to, the following:

- There were two (2) Christmas parties during Plaintiff's tenure at Berardinelli's under Carriage Services. Plaintiff was not consulted with respect to the planning or execution of either of them. Judy Keane was involved, as was Karla Smail.
- Plaintiff was not consulted when the lobby was remodeled. Judy Keane was involved.
- Plaintiff was not consulted when the storage room was remodeled. Judy Keane was involved.
- Plaintiff was removed from his office and transferred to the former storage room without consulting with him. Judy Keane was involved.
- Plaintiff was not consulted with respect to any of the several hirings that took place during Plaintiff's 14 months under Carriage Services. Judy Keane was involved.
- Plaintiff was not consulted with respect to numerous personnel decisions of a disciplinary nature that took place during his 14 months under Carriage

Services. On those occasions when Plaintiff asked Bob Clifford about these matters, he flatly told Plaintiff that he would not discuss personnel issues with him. Judy Keane was made privy to this information, based on various comments that she made to Plaintiff during the course of his employment.

o  Regarding personnel matters, it came to Plaintiff's attention that Karla Smail, who was licensed to meet with members of the public only on a "Pre-Need" basis (i.e., when a death had not occurred in the family, but the client was planning for the future), was meeting with clients when a death had occurred in the family. In other words, she was acting outside the scope of her licensure by meeting with "at need" instead of "pre-need" clients. This is considered a serious violation of state licensing laws. Plaintiff brought this to the attention of Bob Clifford, who gave no response whatsoever to Plaintiff's concern, and never followed up with Plaintiff.

o  Robert Berardinelli, the brother of Rick Berardinelli, lost his license as a Funeral Service Practitioner, upon information and belief as a result of drug-related charges or a conviction for drug-related offenses. Bob Clifford told Plaintiff in passing one day that we could no longer contract Robert Berardinelli, because he no longer had a license. However, Clifford would not discuss with Plaintiff the basis for this action, or how he obtained the information. This was characteristic of his keeping Plaintiff always "out of the loop" on personnel matters. When Clifford mentioned this to him, Plaintiff did manage to get out of Clifford that he had known for some time

that Robert Berardinelli had lost his license, yet he had continued to authorize his use as an embalmer on a contract basis. By concealing this information from Plaintiff, Clifford jeopardized Plaintiff's own license, as Plaintiff had used Robert Berardinelli on occasion as a contract service provider, with Clifford's approval. It is clear that the information that Berardinelli had lost his license was concealed from Plaintiff and that Plaintiff's superior, Bob Clifford, as well as Rick Berardinelli, who by that time had returned to Carriage Services as Location Manager, did know.

- Although Plaintiff was given check signing authority, which Plaintiff used only occasionally, it was reasonably apparent that others had check signing authority as well. Sometime around Plaintiff's eleventh month under Carriage Services, Judy Keane, the Office Manager, began to comment to Plaintiff that Plaintiff should not have check signing authority.

- Plaintiff was not consulted with respect to financial management issues at Berardinelli's. Judy Keane was always involved in these issues.

- Bob Clifford met with Regional Vice Presidents on many occasions when they would visit in Santa Fe, and telephonically. Plaintiff was never asked to participate. Judy Keane was frequently involved in these meetings.

- Financial Reports and Projections were received by Bob Clifford on a regular basis from Carriage Services. He never shared these with Plaintiff. He did share this information with Judy Keane.

SISNEROS vs. CARRIAGE SERVICES OF NEW MEXICO, INC.
COMPLAINT FOR RACE/NATIONAL ORIGIN DISCRIMINATION
PAGE 8

25. Soon after she learned that Mr. Lujan, the former owner of Lujan Funeral Home in Taos, had died, Judy Keane strongly suggested to Plaintiff that Plaintiff go and work for Lujan's or buy Lujan's Funeral Home;

26. Defendant later charged that Plaintiff had committed some act of disloyalty towards Carriage Services when he negotiated with Mr. Lujan's widow to purchase the Lujan's Funeral Home in Taos. In response to that, Plaintiff states as follows:

    a. At the time that Plaintiff negotiated with Mrs. Lujan, which was only about one week, as the defendant observes, before Plaintiff was formally demoted from Plaintiff's position as Assistant Manager, it was clear to Plaintiff that Plaintiff's services at Berardinelli's were not appreciated, and that Plaintiff's contract of employment with Carriage Services had already been breached;

    b. At the time that Plaintiff negotiated with Mrs. Lujan, it was not clear that Plaintiff would be operating the funeral home in Taos himself. Plaintiff was interested in this funeral home as an investment, but others could have operated it while Plaintiff remained employed at Berardinelli's;

    c. It is incorrect to state that Lujan's Funeral Home in Taos is a "competitor" of Berardinelli's in Santa Fe, as the defendants state. Based on Plaintiff's years of experience in the industry, Lujan's, which is located some 75 miles distant from Berardinelli's, was not in the same market. This is emphasized by the "non-compete clause" in Plaintiff's employment agreement, which only restricts Plaintiff from working in the industry within fifty (50) miles of Santa Fe. Clearly, Carriage Services itself does not consider Lujan's in Taos to be in the same

market, or the "non-compete clause" would have included Taos in the restricted area;

d. Despite the fact that Carriage Services had treated Plaintiff poorly, and Plaintiff was for every good reason unhappy with them, at the time that Plaintiff negotiated to purchase Lujan's in Taos, this was not any act of disloyalty to Carriage Services, nor is it obvious from anything in Plaintiff's employment agreement that this was an act of disloyalty.  Plaintiff do not perceive an investment as being the type of "business activity" that would interfere with Plaintiff's duties at Berardinelli's.  It was not until after Plaintiff was formally demoted at Berardinelli's on January 16, 2001, that it became unmistakably clear to Plaintiff that Plaintiff needed to leave Berardinelli's, and it was afterwards that Plaintiff reached a decision to be personally involved in the day-to-day operation of Lujan's Funeral Home in Taos.  This was first suggested to Plaintiff by Judy Keane, Plaintiff's *de facto* superior at Berardinelli's, whom Plaintiff understand to be regarded as a loyal Carriage Services employee.  Given her suggestion and everything that had transpired, it was clear that Plaintiff needed to make some arrangements to sustain himself and his family;

27.   Carriage Services has also alleged that there were multiple reasons why it could have terminated Plaintiff from his employment.  None of the alleged incidents, with the exception of an allegation regarding misuse of a computer to view internet sites, was ever brought to Plaintiff's attention by Carriage Services or used as the basis for any disciplinary action against him.  Plaintiff was never told that Plaintiff's being demoted was the result of any

disciplinary reason. There is nothing in Plaintiff's contract of employment that would allow Carriage Services to demote Plaintiff during the five-year term of the contract, although the employment contract is very specific about stating that Carriage Services could fire Plaintiff under certain circumstances;

28. Plaintiff received only one Performance Evaluation, which was very positive, from Carriage Services during Plaintiff's 14 months working under them. There was never any indication given to Plaintiff that Plaintiff was in any type of performance-related or disciplinary-related situation, other than the internet issue, which occurred many months prior to January 2001. After he returned to Berardinelli's as Location Manager, Rick Berardinelli often went into the conference room when Plaintiff was making funeral arrangements and told family members that they were in "good hands" with Plaintiff;

29. Carriage Services also cited to a "survey" it had conducted as evidence that Plaintiff was not well regarded by the public. Plaintiff knew nothing about who participated in answering the survey, or how the results were tabulated. Plaintiff does know however, that Plaintiff received numerous "Thank You" cards and gifts of appreciation from many families over the years that tell a different story. Many family members have also walked into Berardinelli's to thank him, and many clients have called Plaintiff at home at all hours of the day and night to request Plaintiff's help. On one occasion, a *viejita* (little old lady) brought Plaintiff a large *charola* (plate or dish) of *enchiladas*, which Plaintiff shared with all the other Carriage Services Employees. The one and only Performance Evaluation Plaintiff ever received from Carriage Services emphasizes what a good "team player" Plaintiff was, and Jeff Hicks, Regional Vice President, sent Plaintiff an e-mail telling him how pleased he was to have Plaintiff on his

team.  After that, Plaintiff also received in the mail a "Thank You" card from Valerie Wages, a training coordinator with Carriage Services, with a Summer Olympics keepsake pin.  Plaintiff received four (4) "Thank You" cards at different times in the mail from René Pollard, who worked with Valerie Wages.  René Pollard also awarded Plaintiff an "Outstanding Service Award," which Plaintiff received in the mail.  It is Plaintiff's understanding that these "Outstanding Service Awards" are displayed at the corporate headquarters in Houston, Texas;

30.    In regards to Carriage Services assertions that Plaintiff committed acts to the detriment of Berardinelli's, it is noteworthy that as of December 26, 2001, his likeness continues to be carried by Berardinelli's on its internet website homepage.  *See* http://www.berardinelli-mortuary.com.  It is highly doubtful that Carriage Services would continue to use Plaintiff's photograph if he were damaging to its reputation;

31.    The Carriage Services "survey" purports that Plaintiff was ranked #83.  Carl Bridges, a non-Hispanic, is the individual ranked #86 on the same survey, is a Carriage Services Regional Vice President, and Plaintiff ranked better than he did.  Carl Bridges manages Bunker's Mortuary in Las Vegas, Nevada, one of the largest funeral homes in the Carriage Services System.  David Bunker, also a non-Hispanic, whom Plaintiff believes is one of the Bunker family of either Bunker's Eden Vale Memorial Park, or Bunker's Memory Gardens Mortuary, both of which are also Carriage Services owned establishments in the State of Nevada, is ranked #90 on the survey.  Plaintiff believes that both Bridges and Bunker continue to be employed by Carriage Services.  At least, Carl Bridges is listed as of November 29, 2001, on the internet

website for Carriage Services as the "Contact" for Bunker's Mortuary. *See* http://www.carriageservices.com and select "Location Map" and "Nevada";

32. Carriage Services also has made significant mention of an incident involving Rubel Romero, deceased, whose body unfortunately reached a state of decomposition after it was brought to Berardinelli's for funeral services. A lawsuit was initiated by the Romero family, and Carriage Services elected to pay a settlement. Now, in this litigation, Carriage Services attempts to lay blame on Plaintiff for this incident. Never, during Plaintiff's tenure with Berardinelli's, did Carriage Services initiate disciplinary action against him, nor did any of its management representatives speak to Plaintiff to state that he had done wrong with respect to the services provided to the Romero family;

33. What really happened in this incident is that Mr. Romero had been deceased for a few days before the family found him in his home, where he lived alone. The morning that he was brought to Berardinelli's, the body was stored at 40° Fahrenheit, which is an appropriate temperature for preservation of human remains. Mr. Romero's body remained stored for 14 days at Berardinelli's, an unusually long time, because the family insisted that an autopsy be conducted by the New Mexico Office of the Medical Investigator (MI) in Albuquerque, and the MI did not want to conduct the autopsy, because the MI felt that there was not enough evidence of any wrongdoing or suspicious nature of the death so as to justify an autopsy. Beyond placing the body into the refrigeration unit, Plaintiff was not the individual in charge of overseeing human remains under refrigeration at Berardinelli's. That responsibility fell to the Location Manager, Bob Clifford. Bob would periodically check on the refrigeration unit, and verify the temperature;

27. Finally, after repeated requests by the Romero family, the MI agreed to conduct an autopsy. The body was taken out of Berardinelli's custody for several days (from August 28th to on or about September 2nd) to conduct the autopsy, and its conditions of transport and storage were beyond Plaintiff's control and not of Plaintiff's knowledge. The MI informed the family that Mr. Romero's body was in a state of decomposition, but Plaintiff have no knowledge of how long after the body was taken from Berardinelli's the autopsy was conducted, or under what conditions the body was transported and stored. Upon information and belief, Defendant Carriage Services never admitted fault in its settlement agreement with the Romero family;

28. On January 16, 2001, Jeff Hicks, Regional Vice President with the Defendant, convened a general staff meeting of the employees of the Berardinelli Family Funeral Service;

29. At said meeting, it was announced that, effective immediately, Plaintiff was demoted from "Assistant Manager" to "Funeral Director." No reasons for this action were given, nor had Plaintiff received any notice of adverse employment action. Moreover, although the Employment Agreement drafted by the Defendant and entered into by and between the Defendant and the Plaintiff specifies the possibility of termination, no possibility of demotion is included therein;

30. Plaintiff's position of "Assistant Manager" was filled with a non-Hispanic. Upon information and belief after diligent investigation, this individual was allowed to fulfill the duties of Assistant Manager;

31. On February 6, 2001, consistent with the announcement made at the general staff meeting on January 16, 2001, Rick Berardinelli delivered to Plaintiff a copy of the position description for Funeral Director;

32. Thereafter, Plaintiff, as a direct and proximate result of the Defendant's conduct towards him, resigned his position with the Defendant;

33. At 6:50 a.m. on February 22, 2001, Regional Vice President Jeff Hicks initiated a telephone call to the Plaintiff's residence, and spoke with the Plaintiff;

34. In his telephonic conversation with the Plaintiff, Hicks was intimidating and threatening, and invoked a "non competition" clause set forth in the aforementioned Employment Agreement, which clause prohibits the employee from engaging in business competition with Defendant for a period of two (2) years within a fifty (50) mile radius of the Defendant's "Territory";

35. Hicks made reference to his belief that Plaintiff was engaging in the funeral service business, and threatened to have a judge "pad lock your building for ten years;"

## COUNT I:  RACE/NATIONAL ORIGIN DISCRIMINATION (DISPARATE TREATMENT)

36. The foregoing paragraphs are herein incorporated by reference as if fully set forth;

37. The acts and omissions of the Defendants toward the Plaintiff complained of herein were as a result a result of Plaintiff's race/national origin:  Hispanic;

38. Plaintiff was treated in a detrimentally different fashion than non-Hispanics employed in similar positions by Carriage Services;

39. Plaintiff's treatment at the hands of the Defendant constitutes discrimination in violation of Title VII, United States Code;

40.     Plaintiff was injured and damaged by said discrimination, financially and emotionally, in amounts to be established at trial and for which he is entitled to just and fair compensation;

## COUNT II:  PUNTIVE DAMAGES

41.     The foregoing allegations are herein incorporated by reference as if fully set forth;

42.     The acts and omissions of Carriage Services give rise to a justification for the award of punitive damages in this case, in that responsible management officials of the Defendant knew and had reason to know that Plaintiff was being treated in a discriminatory fashion, and did nothing to stop or curtail said discriminatory treatment;

43.     An award of punitive damages is therefore justified in this case, so that this Defendant and others may be dissuaded from acting in the same or similar fashion in the future.

**WHEREFORE,** Plaintiff prays that the Court accept his Complaint, and after reasonable discovery is completed, order trial by jury on the merits of his complaint, and after trial award Plaintiff his damages, punitive damages, reasonable attorney's fees, and costs of this action.

Respectfully Submitted:

_____
Dennis W. Montoya
MONTOYA LAW, INC.
Attorney for Plaintiff
1905 Lomas Boulevard, NW
Albuquerque, NM  87104

(505) 246-8499
(505) 246-8599 (Facsimile)